## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,

                              Plaintiff,

    v.

W.L. GORE & ASSOCIATES, INC.,

                            Defendant.

Civil Action No. 1:24-cv-03656

## COMPLAINT

Plaintiff, the State of Maryland (the "State"), by and through Anthony G. Brown, Attorney General of Maryland, and counsel, on behalf of the Maryland Department of the Environment ("MDE"), the Maryland Department of Health ("MDH"), and the Maryland Department of Natural Resources ("DNR"), files this complaint against Defendant W. L. Gore & Associates, Inc. ("Gore" or "Defendant") to address Gore's releases of so-called "forever" chemicals into Maryland's environment for more than fifty years and in support thereof alleges as follows:

## INTRODUCTION

1.      The State of Maryland owns and holds in trust the public lands, waters, and resources within its boundaries, and is responsible for the preservation and perpetuation of those natural resources.  The State also works to protect the health, safety, and welfare of its residents.  The State brings this action to redress Gore's contamination of Maryland's natural resources with toxic per- and polyfluoroalkyl substances ("PFAS"), including but not limited to the hazardous substance perfluorooctanoic acid ("PFOA").

2.      PFAS are synthetic chemical compounds that are used in a variety of consumer products, including GORE-TEX®, Scotchgard®, and Teflon®.  PFAS are toxic, mobile and persistent in the environment, and cause extensive and long-lasting environmental contamination.

3.      Gore's manufacturing operations involved the use of polytetrafluoroethylene ("PTFE") and PFAS in its manufacturing processes.  Gore has caused widespread PFAS contamination from its multiple facilities in and around Elkton, Maryland by way of decades-long releases of PFAS into the environment.

4.      Gore owns and operates 14 facilities in and around Elkton, Maryland, including several facilities clustered at the same locations.  All 14 facilities are within 10 miles of each other and within the same zip code.

5.      At and in the vicinity of at least 13 of those facilities, Gore released, discharged, dumped, and/or emitted PFAS that have entered the State's environment through multiple pathways, contaminated its natural resources, and put its residents' health at risk.  A map depicting these is below.



1 - Cherry Hill
2 - Fair Hill
3 - Appleton Central
4 - Appleton East
5 - Appleton North
6 - Appleton South
7 - Elk Creek 1, 2, and 3
8 - Elk Mills 1
9 - Elk Mills 2
10 - Elk Mills 3
11 - Lovett

6.    At the same time that Gore was profiting from the products it manufactured in Maryland, it knew for decades that PFOA was toxic and posed significant risks to human health and the environment and failed to warn the State or the communities living around its facilities of the dangers posed by its PFAS.  Instead, Gore concealed those dangers to protect its corporate image and limit its liability.

7.    Gore knew that PFAS, now commonly referred to as "forever" chemicals, were persistent and would remain in the environment for hundreds of years, leaving a toxic legacy for generations to come.

8.    Gore's acts and omissions concerning the PFAS released from its facilities have caused significant PFAS contamination in the State's drinking water, groundwater, surface water, soil, sediment, wildlife, other natural resources, and property held in trust or otherwise owned by the State.

9.    Maryland residents living near Gore's facilities have been and continue to be exposed to PFAS through contaminated drinking water and ingestion or inhalation of contaminated soil and dust, among other ways.

10.    Exposure to PFAS may lead to significant negative health effects, including but not limited to:

- Reproductive effects including decreased fertility and pregnancy-induced hypertension;

- Developmental effects in children including low birth weight, accelerated puberty, bone variations, or behavioral changes;

- Increased risk of certain cancers, including prostate, kidney, and testicular cancers;

- Immune system effects, including reduced vaccine response;

- Interference with the body's natural hormones; and

- Increased cholesterol and/or increased risk of obesity.[1]

---

[1] Environmental Protection Agency, Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited Dec. 18, 2024).

11.    Although Gore knew that its manufacturing in Cecil County would release PFAS into the environment, endanger people and natural resources, and require significant expense to remediate, it concealed that information from the State and the public.

12.    For decades, the State was unaware of the risks posed by Gore's activities in Maryland as a result of Gore's concealment.

13.    Although Gore is now conducting a limited investigation into the extent of PFAS contamination around its facilities, this investigation comes decades after Gore knew of the potential risks.    Moreover, Gore has not fully delineated the scope of that contamination and has concluded that some sites do not warrant *any* PFAS sampling. While the full extent of PFAS contamination from Gore's facilities is not yet understood, the State already has incurred costs necessary to investigate, treat, and remediate the contamination that Gore has caused.

14.    Maryland therefore brings this action to hold Gore responsible for the consequences of Gore's releases of PFOA and other PFAS into Maryland for more than 50 years.    Despite its knowledge regarding the potential risks to human health and the environment, and its awareness of the need to abate and mitigate PFAS releases from its Maryland operations, Gore failed, for decades, to prevent PFAS releases into the air, lands, and waters around its facilities.

15.    Gore created and profited from its PTFE and "expanded" PTFE ("ePTFE") products while using Maryland's natural resources as a dumping ground for PFAS. Thus, Gore—and not Maryland's residents—must pay to address the PFAS contamination from its facilities.

16.    Gore contaminated soil, groundwater, surface waters, and drinking water supplies in Maryland with PFOA and other PFAS via aerial emissions and discharges to water.  Gore's actions have contaminated the State's natural resources and have put Maryland residents' health at risk.  Through this complaint, the State seeks to (a) recover all past and future costs to investigate, remediate, and restore lands and waters of the State contaminated by PFOA and other PFAS discharged and emitted from Gore's 13 facilities in and around Elkton; (b) abate the public nuisance created by Gore's PFAS emissions, discharges, and releases; and (c) obtain damages for injuries resulting from the contamination.[2]

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution.

18.    This Court has personal jurisdiction over Gore because Gore will be served with process in Maryland; transacts business in Maryland; performs work in Maryland;

---

[2] This action does not assert any liability on Gore's part regarding the use, manufacture, or sale of aqueous film-forming foam ("AFFF") or fluorosurfactants that were designed for and specifically incorporated into AFFF.  For the purposes of this complaint, the term "PFAS" does not include AFFF or fluorosurfactants that were designed for and specifically incorporated into AFFF.

contracts to supply goods in Maryland; manufactures products or performs services in Maryland; caused tortious injury in Maryland; engages in a persistent course of conduct in Maryland; derives substantial revenue from manufactured goods, products, or services used or consumed in Maryland; and/or has interests in or uses real property in Maryland.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Gore is considered a resident of Maryland, under 28 U.S.C. § 1391(c)(2) as an entity over which this Court has personal jurisdiction.  Venue is also proper under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 9613(b), because the events and/or omissions giving rise to the State's claims occurred in Maryland, and the property that is the subject of the action is situated in Maryland.

## PARTIES

*Plaintiff, the State of Maryland*

20.    The State brings this action (a) directly in its own right, (b) in its *parens patriae* capacity, (c) as trustee of Maryland's natural resources, and (d) under its police powers.

21.    The State has an interest as a sovereign and natural resource trustee in protecting the natural resources of the State from contamination.  The contamination of the State's natural resources by PFAS constitutes injury to the person and property of the State's residents and to the natural resources of the State, which are held in trust by the State on behalf of all its residents.  The State may, for the common good, exercise all the authority necessary to protect its interests and those of its residents.

22.    The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust (i.e., the natural resources) for the beneficiaries of the trust (i.e., the public). Protection of the natural resources of the State is a matter of public concern in which the State has an interest apart from that of particular individuals who may be affected.

23.    The State brings this action pursuant to its police powers, which include but are not limited to its powers to prevent and abate pollution of the natural resources of the State, to prevent and abate nuisances, and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

24.    The State holds significant direct property interests in State-owned lands that have been contaminated by PFAS from Gore's operations, including but not limited to the Fair Hill Natural Resources Management Area.

25.    The State, through its Attorney General, also brings this action under Title 7 of the Environment Article, which empowers the Secretary of the Environment, through the Attorney General, to bring suit against any person who "stores[s], discharge[s], treat[s], or dispose[s] of a controlled hazardous substance in this State except: (1) in a controlled hazardous substance facility; and (2) in accordance with [Subtitle 2]." Md. Code Ann. Envir. §§ 7-224, 7-263(a).

26.    The State, through its Attorney General, also brings this action under Title 9 of the Environment Article, which empowers the Secretary of the Environment, through the Attorney General, to bring suit against any person who "discharge[s] any pollutant into the waters of this State" without a permit. Envir. §§ 9-322, 9-339(a).

27.    The responsibilities of the Attorney General include the investigation, commencement, and prosecution of civil suits on the part of the State. *See* Md. Const. art. V, § 3. "[T]he Attorney General has general charge of the legal business of the State." Md. Code Ann. State Gov't § 6-106.

28.    The State is also authorized to seek response costs and declaratory relief from responsible parties, like Gore, pursuant to CERCLA, 42 U.S.C. § 9607, *et seq.*

29.    As a result of Gore's acts and omissions as alleged herein, the State has suffered and will continue to suffer injuries to its natural resources and has incurred and will continue to incur costs; to monitor, treat, remediate, and remove PFAS; and to provide oversight of such activities.

**Defendant, W.L. Gore& Associates, Inc.**

30.    Defendant W.L. Gore & Associates, Inc., is a Delaware corporation with its principal place of business at 555 Paper Mill Road, Newark, Delaware 19711. Gore is authorized to conduct business in Maryland. Gore's registered agent for service in Maryland is The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville, Maryland 21093-2264.

31.    Gore was founded in 1958 by Wilbert "Bill" Gore, a chemical engineer and chemist who worked for E.I. DuPont de Nemours and Co. ("DuPont") before he left to start Gore with his wife, Genevieve Gore. Today, Gore is a privately held, global materials science company that reports at least $4.8 billion in annual revenues. Gore specializes in the manufacture of fluoropolymer products and their application in a variety of products, including high-performance fabrics used in GORE-TEX® brand products and products

used in the healthcare, life sciences, mobile electronics, automotive, textiles and apparel, and aerospace industries.

32.     Gore is the owner and operator of 13 industrial properties in or around Elkton, several of which are clustered in groups at multi-facility campuses.   These facilities, which are the subject of this Complaint (and referred to collectively as the "Gore Facilities"), include:

a.   The Cherry Hill facility, located at 2401 Singerly Road, Elkton, Maryland 21921 ("Cherry Hill");

b.   The Fair Hill facility, located at 101 Lewisville Road, Elkton, Maryland 21921 ("Fair Hill");

c.   The four Appleton facilities (collectively, "Appleton"):

(1)   Appleton Central, located at 301 Airport Road, Elkton, Maryland 21921;

(2)   Appleton East, located at 201 Airport Road, Elkton, Maryland 21921;

(3)   Appleton North, located at 401 Airport Road, Elkton, Maryland 21921;

(4)   Appleton South, located at 100 Airport Road, Building 1, Elkton, Maryland 21921;

d.   The three Elk Creek facilities, Elk Creek 1, 2, and 3 (collectively, "Elk Creek"), all located at 295 Blue Ball Road, Elkton, Maryland 21921;

e.   The three Elk Mills facilities (collectively, "Elk Mills"):

1)   Elk Mills 1, located at 501 Vieves Way, Elkton, Maryland 21921;

2)   Elk Mills 2; located at 402 Vieves Way, Elkton, Maryland 21921;

3)   Elk Mills 5; located at 105 Vieves Way, Elkton, Maryland 21921; and

      f.   The Lovett facility, located at 101 Lovett Drive, Elkton, Maryland 21921.[3]

## FACTUAL ALLEGATIONS

**A.    PFAS Endangers Maryland's Environment and Residents.**

33.    PFAS are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms.  The carbon-fluorine bond is one of the strongest bonds in chemistry and imparts to PFAS their unique chemical properties.

34.    The PFAS family, including PFOA, GenX, PFHxA, and PFHpA, has characteristics that cause extensive and long-lasting environmental contamination.

35.    PFAS are mobile and persistent in the environment.  Because they are water soluble, PFAS quickly spread once introduced into the environment.  PFAS also persist in the environment indefinitely because of their multiple carbon-fluorine bonds, which are exceptionally strong and stable, and are resistant to metabolic and environmental degradation processes.  Removing PFAS from drinking water sources, soil, groundwater, and other natural resources requires specialized, and expensive, treatment systems.  In short, once released, PFAS migrate through the environment, resist natural degradation, contaminate soil, groundwater, and drinking water, and are difficult and costly to remove.

---

[3] Gore operates an additional facility in Elkton, the Left Bank facility, located at 505 Blue Ball Rd., Bldg. 310, Triumph Industrial Park, Elkton, Maryland 21921.  The State is not at this time asserting claims with regard to the Left Bank facility, based on Gore's representations that no manufacturing occurred there and that "extruded scrap PTFE material" was stored there but in a covered warehouse with no exposure to stormwater. The State reserves all rights in connection with any PFAS contamination resulting from Gore's use of the Left Bank facility.

36.     PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are excreted from individual organisms only slowly, ongoing low-level exposure results in a buildup of PFAS within the body.  As a result, PFAS can also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

37.     PFAS are toxic and cause significant adverse effects to human health.  PFOA exposure is associated with numerous adverse health effects in humans, including increases in serum lipids (i.e., high cholesterol); decreases in antibody response to vaccines; high blood pressure and preeclampsia during pregnancy; decreased birthweight, testicular and kidney cancers, ulcerative colitis, and thyroid disease.

38.     In March 2021, the Environmental Protection Agency ("EPA") issued a final determination to regulate two PFAS, PFOS and PFOA, as contaminants under the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq*.  In March 2023, EPA proposed a regulation to establish drinking water standards for PFOS, PFOA, PFHxS, PFNA, PFBS, and HFPO-DA.

39.     EPA finalized the proposed Safe Drinking Water Act regulation on April 10, 2024, and published it on April 26, 2024.  *See* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024) (to be codified at 40 C.F.R. Parts 141 and 142).  The maximum contaminant level ("MCL") for PFOA is set at 4.0 parts per trillion (or "ppt"), which is at or near the level of detection under current methods.  The MCL for HFPO-DA is 10 ppt.  EPA "expects that over many years the final rule will prevent PFAS

exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses."[4]

40.    Also in April 2024, EPA finalized health-based Maximum Contaminant Level Goals ("MCLGs") for these PFAS, including an MCLG of zero for PFOA, and 10 ppt for HFPO-DA.

41.    In addition, EPA finalized the designation of PFOS and PFOA as hazardous substances under CERCLA in April 2024, finalizing a rule that had been proposed in September 2022.

42.    At the same time, EPA worked on a parallel track to establish health advisory limits for PFAS and regulate it through other environmental laws.  On June 15, 2022, EPA lowered the Health Advisory Limits for PFOA and PFOS.  The new interim Health Advisory Limits are 0.004 ppt for PFOA and 0.02 ppt for PFOS.

43.    EPA has also sought to limit certain PFAS in manufacturing.  In January 2023, EPA proposed a significant new use rule under the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*) for inactive PFAS, i.e., PFAS that are currently on the statute's Chemical Substance Inventory but have not been used in manufacturing or processing since 2006.  The proposed rule would require any person to notify EPA 90 days before commencing the manufacture, import, or processing of any of the designated PFAS for a significant new use, so that EPA can make a determination that the significant new use

---

[4] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited Dec. 18, 2024).

does not pose an unreasonable risk of injury to health or the environment or, if it cannot make that determination, take regulatory action as necessary.

44.    Industrial facilities that manufacture or use PFAS, such as the Gore Facilities, are a major source of PFAS contamination in the environment.  PFAS are released from these facilities to the land, into the water, and, significantly, through air emissions, which can lead to PFAS contamination in soils, surface water, groundwater, and other natural resources.  Widespread contamination has been found around several manufacturing facilities where PFOA was used or released, including but not limited to Chemours' Washington Works facility in Washington, West Virginia, where PTFE has been manufactured since the 1950s.[5]

45.    The PFAS that has contaminated Maryland's environment as a result of Gore's actions and omissions will not degrade, and the contamination will persist until the PFAS is removed.

**B.    Gore's History Regarding PFOA, APFO, and Use in the Creation of Gore's PTFE and ePTFE.**

46.    Since Gore was founded in 1958, the company has used PTFE to manufacture a variety of products in a wide range of fields, including performance fabrics, electronics, medical devices, and polymer processing.[6]

---

[5] The facility was previously owned and operated by E.I. DuPont de Nemours and Company (n/k/a EIDP, Inc.) ("DuPont").

[6] https://www.gore.com/about/the-gore-story#our-history (last visited Dec. 18, 2024).

47.     In 1969, Gore invented "expanded" PTFE, or "ePTFE," by stretching PTFE. Expanded PTFE is used in a variety of applications and industries.

48.     Gore processes fluoropolymers, primarily PTFE, at its Elkton manufacturing locations.  Gore has acknowledged that, historically, it used PTFE products containing residual ammonium perfluorooctanoate ("APFO"), which is the ammonium salt form of PFOA.  Gore used APFO largely in the form of fine powder, but it also purchased and used an aqueous PTFE product—referred to as an "aqueous dispersion"—at its Maryland facilities.  Gore knew that both the fine powder and the dispersion forms of PTFE that it used contained APFO, and it has stated that APFO concentrations were higher in the dispersions than in the fine powders.

49.     Upon information and belief, separate and apart from PFAS contained in PTFE products, Gore also directly used PFOA or other PFAS in its activities at one or more of the Gore Facilities., including in the form of PTFE scrap material.

50.     APFO dissociates to PFOA in water, and Gore's use of these products in its manufacturing operations caused PFOA and other PFAS to be released from the Gore Facilities, including in process waste streams and air emissions.

51.     Gore has used and continues to use PTFE in the manufacturing process at 11 of the Gore Facilities in Elkton.  Specifically, Gore used PTFE aqueous dispersions at Cherry Hill, Fair Hill, Appleton South, all three Elk Creek facilities, and Elk Mills 1.  In addition, the Appleton East, Appleton North, Appleton Central, and Elk Mills 5 facilities processed solvents, coatings, and other materials known to contain APFO.

52.     Gore has not conducted any sampling to determine whether PFOA or other PFAS are detected around the remaining two Gore Facilities—Lovett and Elk Mills 2— because it claims that those facilities did not process APFO-containing materials. That Gore did not process APFO-containing materials at those facilities, even if true, would not necessarily mean that they do not contain PFAS. For example, to the extent manufacturing did not begin at the Lovett facility until after PTFE suppliers had moved away from the use of PFOA, the manufacturing processes could still be the source of other types of PFAS contamination, including Gen X. And Gore's conclusion that Elk Mills 2 need not be sampled is based solely on a review of historical records. Testing is required at these facilities to determine the accuracy of Gore's assumptions.

53.     Upon information and belief, for decades, Gore purchased PTFE products from DuPont, which manufactured, marketed, and sold PTFE products, including those under the brand name Teflon®.

54.     Until around 2013, DuPont used APFO (the ammonium salt form of PFOA) at its own Washington Works plant to manufacture several PTFE fluoropolymer products, including fine powders, fluorinated ethylene propylene ("FEP"), and aqueous dispersions. PFOA was used to aid polymerization in DuPont's processes and remained in the products that went to DuPont's customers. For decades, Gore used those same products at its facilities in Elkton.

55.     Until 2002, DuPont purchased APFO from The 3M Company ("3M"). 3M's APFO contained additional PFAS as impurities, including perfluorohexanoic acid ("PFHxA") and perfluoroheptanoic acid ("PFHpA").

16

56.     By around 2013, DuPont had transitioned to using GenX to manufacture its PTFE fine powders, FEP, and aqueous dispersions.  GenX is a family of chemicals including HFPO dimer acid ("HFPO-DA"), which is a PFAS chemical.  Upon information and belief, GenX would also have been present as an impurity in the PTFE that Gore obtained from DuPont and used in the Gore Facilities following the transition from PFOA to GenX.

57.     In 2015, DuPont transferred its fluoropolymer business to the newly spun-off Chemours Company ("Chemours").  Chemours continues to make PTFE fine powders, FEP, and dispersions at the Washington Works plant.

58.     Upon information and belief, Gore remained a customer through the transition from DuPont to Chemours, and from the use of PFOA to HFPO-DA.  In 2018, Chemours awarded Gore the "Plunkett Grand Prize," named after the DuPont chemist who discovered Teflon.  The Plunkett Award pre-dates DuPont's spinoff of Chemours.  The award, which Gore has won many times, "recognize[s] advancements in products and applications across the Chemours fluoropolymer portfolio, including Teflon™ fluoropolymers" and "[e]ntrants are evaluated for the innovation and value of products, technologies, and applications *enabled by Chemours portfolio of fluoropolymers*."[7] Chemours' decision to give Gore this award three years after DuPont's spinoff of Chemours suggests that Gore continued to use Chemours' fluoropolymer products—e.g., PTFE products.

---

[7] https://www.gore.com/news-events/press-release/plunkett-award-for-high-temperature-capacitors (emphasis added; last visited Dec. 18, 2024).

**C.    Gore Knew, or Should Have Known, of the Harm Caused by its PFAS Contamination.**

59.    Gore was founded by a prior DuPont employee, and, upon information and belief, Gore and DuPont maintained a close customer relationship for many decades.  For example, at least one individual, Dr. Jack Hegenbarth, had detailed knowledge regarding the potential risks of PFOA and the potential for environmental contamination from fluoropolymer manufacturing.  Dr. Hegenbarth took his years of knowledge and experience working with PFOA issues at DuPont to Gore in or about 1990.

60.    DuPont began using PFOA in the 1950s, and shortly thereafter developed an understanding of the dangers associated with PFAS.

61.    For example, DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs.  DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

62.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects were attributable to PFOA exposure.  This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

18

63.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.  DuPont did not share these data or the results of its worker health analysis with its customers, the general public, or government entities.

64.    The following year, DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

65.    Not only did DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her unborn child.  In 1981, DuPont conducted a blood sampling study of pregnant or recently pregnant employees.  Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

66.    DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but it concealed the results of the study of its own plant workers, which revealed the same risk in humans.

67.    DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water.  DuPont's Medical Director had warned as early as 1982 about the potential for community exposure to PFOA through air emissions venting from the dryers in the PTFE fine powders process at Washington Works.

68.     On or about May 22, 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues related to PFOA (which DuPont called "C-8") and DuPont's potential liability (the "1984 Meeting").

69.     By the time of the 1984 Meeting, DuPont was aware that PFOA had been detected in drinking water around the Washington Works plant, including across the Ohio River in Ohio (confirming the Medical Director's earlier warning that PFOA was traveling by air).

70.     The employees in attendance at the 1984 Meeting spoke of the PFOA issue as "one of corporate image, and corporate liability."  They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."  They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business and that these departments had "no incentive to take any other position."

71.     Dr. Jack Hegenbarth was one of the attendees at the 1984 Meeting.  Two years earlier, on September 28, 1982, Dr. Hegenbarth was copied on an internal DuPont memorandum reporting results of a study done on female employees after they had been transferred out of the PTFE manufacturing area, indicating that PFOA is retained in the blood.

72.     In 1983 and 1984, both before and after the 1984 Meeting, internal DuPont memoranda discussed options for abating PFOA air emissions from Washington Works,

20

including in the PTFE fine powders area. Dr. Hegenbarth is listed as a recipient on these documents. For example, a memorandum dated April 5, 1984, evaluated various emission control options but concluded that none was practical, in part because they would increase the cost of manufacturing PTFE fine powders. That same memorandum noted that "thermal destruction" (i.e., incineration or thermal oxidation) had the highest chance of success, but a subsequent memorandum dated June 28, 1984, expressed a specific concern about "continued emission of C-8 to the atmosphere."

73.    DuPont's knowledge of human health risks from PFOA exposure continued to grow during the 1980s and 1990s. By 1988, DuPont began treating PFOA internally as a possible human carcinogen. Yet throughout the following decade, DuPont increased its use and emissions of PFOA despite mounting evidence that it posed a serious risk to human health. For example, in 1999 DuPont received preliminary results from a health study showing that monkeys, even when given the lowest doses of PFOA, suffered liver enlargement, with one so ill it had to be euthanized. Upon information and belief, Gore had access to this and other data indicating PFOA's toxicity.

74.    Dr. Hegenbarth later became a Gore employee, in or about 1990, at Gore's Cherry Hill facility. Dr. Hegenbarth took with him his knowledge about PFOA's biopersistence, its ability to contaminate off-site drinking water, and its toxicity. Upon information and belief, Dr. Hegenbarth's role included advising Gore on how to minimize PFOA emissions at its Maryland facilities. Yet PFOA contamination has been found at every Gore facility tested to date.

75.    Dr. Hegenbarth was not the only DuPont employee with fluoropolymers experience to move to Gore. Mr. Richard Baillie was a chemical engineer who worked in several roles in DuPont's fluoropolymers operations between 1980 and 1996. In or about March 1996, he joined Gore where, according to Mr. Baillie, he played a "key role" in understanding and dealing with the "PFOA issue."

76.    While still with DuPont, Mr. Baillie was listed as one of many recipients of a September 28, 1994, memorandum attaching a report by Roger Zipfel titled "C8 Ammonium Perfluorooctanoate Fluorosurfactant Strategies and Plans" ("The Zipfel Report"). The Zipfel Report noted that the "slow clearance of C-8 from human blood" "justifies the setting of a low permissible exposure" and evaluated strategies for reducing environmental emissions—for example, replacing PFOA "with other less toxic materials." The Report also discussed implementing certain engineering controls to reduce exposure, including scrubbing the emissions from the PTFE fine powders area of DuPont's Washington Works plant. The Zipfel Report estimated the final fate of PFOA used at multiple DuPont manufacturing sites and concluded that, for 1993, more than 14,000 pounds of PFOA left those plants in products destined for customers like Gore. Mr. Baillie, therefore, was on notice that the PTFE products that Gore purchased from DuPont and used in the Gore Facilities contained PFOA.

77.    In addition, Appendix A to the Zipfel Report detailed DuPont's "1994 C-8 Plan," one aspect of which was to "Initiate C-8 recycle and recovery from U.S. Gore." The Zipfel Report thus suggests that DuPont and Gore explored recapturing PFOA the waste streams at the Gore Facilities for DuPont to "recycle" and re-use.

78.     An internal DuPont document dated January 7, 1997, identifies Gore as a potential "first tier" external customer for evaluations of replacement surfactants, including in the manufacture of expanded PTFE.  DuPont also noted that Gore had "shown interest" in products made with a polymer processing aid other than PFOA, and that Gore had a "self-imposed C-8 containment practice."

79.     Gore's interest in alternatives to PFOA suggests that it had access to information from DuPont (and potentially other suppliers) about the adverse health effects of PFOA and had concerns about potential releases from its Maryland facilities.

80.     In February 1998, a DuPont internal document called "C-8 Integrated Program Plan," prepared by Roger Zipfel and others, noted that: "Our customers, with the exception of Gore, have not expressed concern about C-8."  It further states the goal of "assist[ing] customers in decreasing emissions and exposure."

81.     In May 2000, DuPont in-house counsel Bernie Reilly sent a personal email reporting 3M's announcement that it would stop making PFOA, "an essential ingredient in the Teflon polymer we sell to big customers like Gore."  The email noted, "We knew the material [3M] sold us, a surfactant, also is very persistent and also gets into blood, but so far no signs it has hurt anyone.  If it does we are really in the soup because essentially everyone is exposed one way or another."

82.     In September 2001, Mr. Reilly sent another personal email saying the following about PFOA: "The compound is an 8 carbon fully fluorinated chain with an ammonia group on the end, a perfect surfactant for our Teflon fine powders that are used

by Gore to coati [sic] fabric.  It is very persistent in the environment, and on top of that, loves to travel in water and if ingested or breathed wants to stay in the blood."

83.    In 2004, EPA filed an administrative enforcement action against DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA").  DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects.  EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."  Upon information and belief, Gore was aware of this public action.[8]

84.    In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."  Upon information and belief, such findings were known to Dr. Hegenbarth, Mr. Baillie, and Gore.

85.    Upon information and belief, Gore was regularly in communication with DuPont employees regarding PFOA issues, including potential methods for abating emissions into Maryland.

86.    Indeed, DuPont stated in a public letter to EPA in 2006 that its "[a]queous dispersions contain higher amounts of residual PFOA (ca. 0.2% or 2000 ppm) some of

---

[8] https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f 665cac66bb852570d7005d6665.html (last visited Dec. 18, 2024).

which can be emitted from processor plant facilities." DuPont further promised to share its PFOA emissions abatement technology with competitors and customers.[9]

87.    Despite this history, Gore continued to use and/or make PTFE at its Elkton facilities, without taking adequate measures to contain PFOA and prevent widespread contamination of the State's natural resources. Upon information and belief, Gore, through these discussions with DuPont and otherwise, knew of the potential for releases of PFOA to air and water from the Gore Facilities and yet did not inform the State.

**D.    Maryland's Affected Natural Resources**

88.    Maryland law establishes the State's right and obligation to protect its natural resources. As set forth by the statutory sections below, the State is the steward of the Maryland environment.

89.    "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the highest public priority." Md. Code Ann. Nat. Res. § 1-302(b).

90.    Pursuant to statute, "[e]ach person has a fundamental and inalienable right to a healthful environment[.]" Nat. Res. § 1-302(d).

91.    "Because the quality of the waters of this State is vital to the public and private interests of its residents and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and

---

[9] https://www.epa.gov/sites/default/files/2015-08/documents/dupontresponse.pdf (last visited Dec. 18, 2024).

impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, and the problem of water pollution in this State is closely related to the problem of water pollution in adjoining states, it is State public policy to improve, conserve, and manage the quality of the waters of the State and to protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." Envir. § 4-402.

92.     The "quality of the waters of this State is vital to the interests of the citizens of this State[.]" Envir. § 9-302(b). "[B]ecause pollution is a menace to public health and welfare, creates public nuisances, harms . . . and impairs domestic, agricultural . . . and other legitimate beneficial uses of water . . . it is the policy of this State: (1) To improve, conserve, and manage the quality of the waters of this State; (2) To protect, maintain, and improve the quality of water for public supplies . . . and (3) To provide that no waste is discharged into any waters of this State . . . to protect the legitimate beneficial uses of the waters of this State." *Id.*

93.     "The General Assembly determines and finds that lands and waters comprising the watersheds of the State are great natural assets and resources." Envir. § 4-101.

94.     "It is the policy of the State of Maryland to: . . . (3) Protect the State's natural resources, including the fish and wildlife of the Potomac River, the Chesapeake Bay, and all other waters and waterways of the State." Envir. § 5-5B-03.

95.    The "waters of the State" include both surface and underground waters within the boundaries of the State or subject to its jurisdiction.  *See* Envir. § 5-101.

96.    Under the Maryland Environmental Standing Act, the "General Assembly finds and declares that the natural resources . . . of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment."  Nat. Res. § 1-502.

97.    PFAS contamination from Gore's facilities has injured and continues to injure the waters and property of the State and the property, health, safety, and welfare of Maryland's residents.

98.    The discharge of PFAS from the Gore Facilities into drinking water constitutes a public nuisance because such discharges create a "condition that is dangerous to health and safety," including a "contaminated water supply" and an "inadequately protected water supply."  Md. Code Ann., Health-Gen. § 20-301(a).

99.    The State owns lands throughout Maryland that it maintains for the benefit of the public, such as parks and wildlife management areas.

100.    The State holds its waters in trust for the State's residents and has an obligation to protect public interests in these waters though, among other things, maintaining the environmental quality of its waters.

101.    The State's natural resources include its waters, such as the springs, streams, wetlands, groundwater, ocean waters, and estuaries, within its boundaries or otherwise subject to its jurisdiction.

102.    Natural resources and State-owned properties have been injured by past and ongoing contamination caused by PFAS attributable to Gore.

103.    PFAS have been found in groundwater, surface water, and soils in Cecil County, Maryland, and the State anticipates that additional PFAS contamination of natural resources will be uncovered as its investigation continues.

104.    Because PFAS does not break down in the environment, PFAS contamination will persist in the State's natural resources, damaging their intrinsic value and impairing the public benefits derived from their use and enjoyment.

105.    The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely upon maintaining a clean environment for their businesses, patrons, and tourists to visit and enjoy.

**1.    Groundwater**

106.    Groundwater is a critical and finite natural resource for the people of the State, as the State relies on groundwater for drinking water, irrigation, and agriculture.

107.    Maryland relies on groundwater for drinking water supplies.  It is the most common form of drinking water supply.

108.    In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State.  Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems.  Groundwater keeps water in rivers during times of drought.

109.    Groundwater promotes the movement of water and nutrients within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides subsurface stabilization, and helps to maintain critical water levels in freshwater wetlands.

110.    Groundwater and the State's other natural resources are unique resources that help sustain the State's economy.

111.    PFAS contamination mobilizes in and through groundwater sources to reach areas beyond the initial source of contamination.  This contamination adversely affects the groundwater.

### 2.    Surface Water

112.    Surface water is a critical ecological resource of the State.  In addition to serving as a source of drinking water, surface water in Maryland is also used for recreational, industrial, agricultural, and other commercial purposes.

113.    Surface water also provides aesthetic and ecological values, including supporting aquatic ecosystems, nearby communities, and the residents of the State.

114.    PFAS are mobile and persistent in water and can spread great distances from the point of discharge.

### 3.    Sediments and Soils

115.    Given the nature of PFAS contamination, PFAS from Gore's facilities has also contaminated soils and sediments.

116.    PFAS-contaminated soil poses a risk to human health.  PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the State.  PFAS in sediments, as well as in surface water, support the potential increase

of PFAS concentrations in fish and agricultural resources. PFAS-contaminated soil and dust can also be inadvertently ingested and/or inhaled, and plants grown for food can uptake PFAS from the soil.

### 4.    Biota

117.    Biota, including the State's flora and fauna, are critical ecological resources.

118.    PFAS contamination threatens animal and plant species because PFAS can cause damage to the liver and immune system of animals and has been shown to damage cell structure and organelle functions in plants.

119.    Natural resource injuries to biota in the State negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

120.    In addition, PFAS are subject to biomagnification in the food chain and contaminated biota can therefore be an additional exposure pathway for humans.

### E.    Gore's PFAS Have Contaminated the State's Natural Resources, Including Sources of Drinking Water, and Gore is Liable for Costs to Remediate and Restore Those Resources.

121.    The State's natural resources have been contaminated with PFAS as a result of Gore's acts and omissions. Gore has caused the contamination of the State's groundwater, surface water, drinking water, and other resources, and exposed the State's residents to substantial health risks.

122.    In addition, the proximity of the Gore Facilities to one another, and the fact that PFOA and other PFAS can contaminate widespread areas through aerial deposition

from industrial sites, mean that certain natural resources may be affected by more than one facility.

123.    The State's investigation is continuing.  The investigation is necessary to ascertain the full scope of the contamination attributable to the Gore Facilities and return the natural resources to the condition in which they existed prior to the impact of these contaminants.

124.    Gore is liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with their PFAS, as well as for the State's loss of past, present, and future uses of such contaminated natural resources.

125.    Most critically, PFAS contamination of groundwater and surface water is impacting the State's drinking water sources.  Gore is liable for all of the costs necessary to investigate and treat in perpetuity any and all drinking water wells and sources of drinking water adversely affected by its PFAS.

126.    On February 16, 2023, MDE sent a letter to Gore identifying it as a potentially responsible party in relation to the Cherry Hill facility and requested Gore to conduct or participate in the systematic investigation of PFAS contamination at the facility and surrounding area.  Gore initially agreed to conduct limited drinking water sampling within a .25-mile radius of the facility.  MDE was forced to bear the cost of expanding the sampling program to homes within a one-mile radius.

127.    In addition, DNR bore the cost of sampling and treating the groundwater at the Fair Hill Natural Resources Management Area, which is next to the Gore Fair Hill

facility.  Sampling conducted by DNR from Spring 2023 through Fall 2024 consistently showed PFOA contamination above the 4 ppt MCL at several locations, as high as 39 ppt. These sampling results also indicate contamination with other PFAS carboxylic acids, including PFHxA and PFHpA.

128.    Data collected to date show exceedingly high levels of PFOA around the Cherry Hill and Fair Hill facilities.  At addresses on Singerly Road, directly across from the Cherry Hill site, multiple residences showed concentrations of PFOA in their drinking water as high as 800 ppt.  The surface water in a small stream nearby returned a result of 740 ppt PFOA.  Near the Fair Hill site, PFOA was found in drinking water sources above 100 ppt PFOA.  And at the Appleton South site, several samples of on-site groundwater had PFOA concentrations well above 1,000 ppt.  These locations are also contaminated with PFHpA, PFHxA, and other PFAS.

129.    To the State's knowledge, elevated levels of PFOA have been found around each of the Gore Facilities that has been tested.

**COUNT I**
**PUBLIC NUISANCE**

130.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

131.    Groundwater, surface water, sediments, soils, and biota are natural resources of the State held in trust by the State.

132.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

133.    The contamination of groundwater, surface water, sediment, soils, and biota with Gore's PFAS constitutes a physical invasion of the State's natural resources and, upon information and belief, real property owned by the State.  That same contamination is also an unreasonable and substantial interference, both actual and potential, with (i) the exercise of the public's common right to these natural resources; (ii) the State's special status and authority regarding the natural resources of the State; (iii) the State's ability to protect, conserve, and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (iv) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

134.    As long as these natural resources contain PFAS caused by Gore's conduct, the public nuisance continues.

135.    Until these natural resources are restored to their pre-injury quality, Gore is liable for the creation and continued presence of a public nuisance in contravention of the public's common right to clean natural resources.

136.    Gore discharged PFAS into the natural resources of the State knowing that this would create a public nuisance.  Moreover, Gore continued discharging PFAS even after it understood the mobile, persistent, bioaccumulative, and toxic nature of PFAS in the environment.

137.    Gore committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## COUNT II
## TRESPASS

138.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

139.    Gore's intentional and/or negligent conduct caused PFAS to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon properties the State owns or over which it holds a possessory interest.

140.    PFAS released from the Gore Facilities continue to be located on or in the State's property, including but not limited to the Fair Hill Natural Resources Management Area.

141.    Gore knew with substantial certainty or should have known that its acts would contaminate the State's property.

142.    Gore is therefore liable for trespass and continued trespass.

143.    Gore did not and does not have authority, privilege, or permission to trespass upon the aforesaid possessory property interests.

144.    The State has never consented to the trespasses alleged herein.

145.    Gore has refused and failed to terminate its trespasses, despite being put on notice to do so by the State through its policies, statutes, regulations, orders, and other means.

146.    Gore's trespass is of a continuing nature and has produced a long-lasting negative effect upon the property of the State, as Gore knew or had reason to know at all times relevant hereto.

147.    Based on its conduct, Gore has, at all times relevant to this action, created, caused, maintained, continued, substantially contributed to, substantially participated in, and/or assisted in the creation of such trespass.  Based on its knowledge of the properties and manner of distribution, use, and storage of PFAS, as alleged herein, Gore was or should have been aware that contamination of the State's property was inevitable or substantially certain to result from its conduct.

148.    As a direct and proximate cause of Gore's conduct, the State has suffered and continues to suffer damages from Gore's conduct and the presence of PFAS in the State's property, including without limitation incurring costs to assess, investigate, monitor, analyze and remediate contamination, costs to prevent PFAS from injuring additional property of the State, and costs to restore and replace the State's impacted natural resources whose use has been lost or degraded.

149.    Gore committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## COUNT III
## NEGLIGENCE

150.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

151.    Gore had a duty to the State to ensure that PFAS were not released as a result of the transport, storage, use, handling, release, spilling, and/or disposal of its PFAS and did not injure groundwater, surface water, sediment, soils, and biota in Maryland.

152.    Gore had a duty to the State to exercise due care in its manufacturing and other operations at the Gore Facilities.

153.    Gore breached these duties by, among other things, failing to conform to the requisite standard of care.

154.    Groundwater, surface water, sediments, soils, biota, and other natural resources where Gore's PFAS have come to be located have become contaminated with PFAS as a direct and proximate result of Gore's negligence.

155.    As a direct and proximate result of the contamination of the environment from Gore's PFAS, the State has incurred, is incurring, and will continue to incur investigation, clean-up and removal, treatment, monitoring, and restoration costs and expenses for which Gore is liable.

156.    Gore committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## COUNT IV
## ENVIRONMENT ARTICLE, TITLE 7, SUBTITLE 2 CLAIM
### (Unauthorized Discharge of Controlled Hazardous Substances)

157.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

158.    MDE is charged with the responsibility of enforcing Title 7, Subtitle 2 of the Environment Article, which governs the control, handling, storage, disposal, and remediation of hazardous substances, including controlled hazardous substances.  Envir. §§ 7-220 through 7-222 and 7-256 through 7-266.  The Attorney General is also authorized to prosecute claims arising under Title 7, Subtitle 2 on behalf of the State.  Envir. § 7-268.

159.    Maryland prohibits the discharge or disposal of a controlled hazardous substance in the State of Maryland except in a controlled hazardous substance facility and in accordance with Title 7, Subtitle 2 of the Environment Article.  Envir. §§ 7-222 through 7-224.

160.    "Hazardous substance" means any substance defined as a hazardous substance under § 101(14) of CERCLA or identified as a controlled hazardous substance by MDE in the Code of Maryland Regulations ("COMAR").  Envir. § 7-201(l); COMAR 26.13.01.03.

161.    "Controlled hazardous substance" is any substance identified by MDE as a hazardous substance, including those substances identified under § 101(14) of CERCLA. Envir. § 7-201(b); COMAR 26.13.01.03.

162.    "Discharge" is defined as the addition, introduction, leaking, spilling, or emitting of a pollutant into waters of the State; or placing a pollutant in a location where the pollutant is likely to pollute waters of the State.  Envir. § 7-201(h).

163.    "Release" means the addition, introduction, leaking, spilling, emitting, discharging, escaping, or leaching of any hazardous substance into the environment.  Envir. § 7-201(s).

164.    PFOA is defined as a hazardous substance under § 101(14) of CERCLA.

165.    PFOA therefore is also a controlled hazardous substance under Title 7, Subtitle 2 of the Environment Article.

166.    Gore does not have a permit to release or discharge PFOA, or any other PFAS that qualify as controlled hazardous substances, into groundwater or surface water.

167.    Gore has discharged controlled hazardous substances into the waters of the State and is liable for civil penalties up to $25,000 per violation.  Envir. § 7-266(a).  Each day a violation occurs is a separate violation under Title 7, Subtitle 2 of the Environment Article.

168.    The State also is entitled to reimbursement for amounts spent under § 7-220 of the Environment Article in response to Gore's release or threatened release of hazardous substances at the Gore Facilities.  Envir. § 7-221.

169.    The State further is entitled to injunctive relief due to Gore's historic and ongoing discharges of controlled hazardous substances into the natural resources of the State.  Envir. § 7-263

170.    Gore committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

171.    The State's investigation remains ongoing, and it reserves the right to seek full recovery for additional violations of Title 7, Subtitle 2 of the Environment Article that are discovered in its investigation.

## COUNT V
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 3 CLAIM
### (Unauthorized Discharge of Pollutants & Wastes)

172.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

173.    MDE is charged with the responsibility of enforcing Title 9, Subtitle 3 of the Environment Article, which governs water pollution.  Envir. §§ 9-334 through 9-344.  The Attorney General is also authorized to prosecute claims arising under Title 9 on behalf of the State.  Envir. § 9-344.

174.    Under Title 9, Subtitle 3 of the Environment Article, a person may not discharge any pollutant into waters of the State without a discharge permit issued by the Department.  Envir. §§ 9-322, 323.  Subtitle 3 also prohibits the unpermitted "discharge of any wastes . . . regardless of volume[.]"  COMAR 26.08.03.01A(1).

175.    "Discharge" is defined as "(1) [t]he addition, introduction, leaking, spilling, or emitting of a pollutant into waters of the State; or (2) [t]he placing of a pollutant in a location where the pollutant is likely to pollute waters of the State."  Envir. §§ 9-101(b); *see also* COMAR 26.08.01.01B(20).

176.    "Waste" is defined to include industrial waste—which refers to any material resulting from any industrial, manufacturing, trade, or business process—and all other "liquid, gaseous, solid, or other substances which will pollute any waters of this State."  COMAR 26.08.01.01B(98); *see also id.* at (40).

177.   "Pollutant" is defined to mean: "(1) any waste or wastewater that is discharged from . . . an industrial source, or (2) any other liquid, gaseous, solid, or other substances which will pollute any waters of the State." Envir. § 9-101(g).

178.   "Pollution" is defined as any contamination or other alteration of the physical, chemical, or biological properties of any waters of the State, including a change in temperature, taste, color, turbidity, or odor of the waters, or the discharge or deposit of any organic matter, harmful organism, or liquid, gaseous, solid, radioactive, or other substance into the waters of this State, that will render the waters harmful or detrimental to: (1) public health, safety, or welfare; (2) domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses; (3) livestock, wild animals, or birds; or (4) fish or other aquatic life.  Envir. § 9-101(h); COMAR 26.08.01.01B(67).

179.   The "Department may bring an action for an injunction against any person who violates any provision of [Subtitle 3] or any rule, regulation, order, or permit adopted or issued by the Department under [Subtitle 3]." Envir. § 9-339(a).  The "court shall grant an injunction without requiring a showing of a lack of an adequate remedy at law." *Id*. § 9-339(c).

180.   Gore is responsible for unauthorized discharges of PFAS into the waters of the State.  As Gore violated and continues to violate Title 9, Subtitle 3 by discharging PFAS throughout the State, MDE is empowered to seek an injunction ordering Gore to investigate and fully delineate the scope of PFAS contamination for which Gore is responsible and to ensure the clean-up of such contamination so that the waters of the State are in the same state they existed prior to the discharges. Envir. §§ 9-339(c); 9-302(b)(1) ("To improve,

conserve, and manage the quality of the waters of this State . . . ."); Envir. § 9-302(b)(2) ("To protect, maintain, and improve the quality of the water . . . .").

181.    Because Gore discharged PFAS into the waters of this State, it "shall reimburse the Department for the reasonable costs incurred by the Department in conducting environmental health monitoring or testing, including the costs of collecting and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect on public health and the environment of the [Gore's] discharge[s]." Envir. § 9-342.2; *see* COMAR 26.14.01.04.

182.    Gore has discharged PFAS into the waters of the State and is liable for civil penalties up $10,000 per violation.  Envir. § 9-342.  Each day a violation occurs is a separate violation under Title 9, Subtitle 3.

## COUNT VI
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 4 CLAIM
### (Injunctive Relief)

183.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

184.    PFAS are "dangerous contaminant[s]" because when they are "present in a public water system, they present an imminent and substantial danger to the health of individuals." Envir. § 9-405(a).

185.    Upon receipt of information that PFAS "[are] present in or likely to enter a public water system," the Secretary of MDE "may take any action necessary to protect the health of the individuals whose health is or would be endangered" by the PFAS.  Envir.

§ 9-405(b)(1).  The actions the Secretary of MDE may take include suing "for injunctive or other appropriate relief."  *Id*. § 9-405(b)(2)(ii).

186.   To stop PFAS from entering public water systems, the Secretary of MDE may seek an injunction that orders Gore to investigate and fully delineate the scope of PFAS contamination for which the Gore is responsible and to ensure the clean-up of such contamination so that the water is in the same state it was in prior to the discharges.

## COUNT VII
## COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, 42 U.S.C. § 9607(A)

187.   The State incorporates by reference the preceding paragraphs as though set forth at length herein.

188.   Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are liable for "all costs of removal or remedial action incurred by . . . a State," occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release," and other forms of compensation.  42 U.S.C. § 9607(a).

189.   Gore has, at all relevant times, been an "owner" and/or "operator" of each of the Gore Facilities.

190.   There have been "releases," 42 U.S.C. § 9601(22), of "hazardous substances," 42 U.S.C. § 9601(14), from Gore's facilities, including releases or threatened releases of PFOA and other PFAS substances exhibiting similar characteristics.  Upon information and belief, these releases or threatened releases are ongoing.

191.    The State has incurred and will continue to incur necessary costs of response pursuant to CERCLA Section 107(a), all of which are consistent with the national contingency plan, as a result of releases and/or threatened releases of hazardous substances at and from the Gore Facilities.  42 U.S.C. § 9607(a)(4)(A).

192.    Upon information and belief, the State has incurred and/or will incur damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such releases and/or threatened releases of hazardous substances from the Gore Facilities.   42 U.S.C. § 9607(a)(4)(C).

### COUNT VIII
### COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, 42 U.S.C. § 9613(g)

193.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

194.    CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 113(g)(2).

195.    The Declaratory Judgment Act further states: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.

196.    An actual controversy now exists because Gore is liable under CERCLA § 107(a) for all costs and damages compensable to the State in connection with the release or threatened release of hazardous substances from the Gore Facilities.   42 U.S.C. § 9607(a).

197.   The State seeks a judicial declaration of rights pursuant to CERCLA § 113(g)(2), binding on Gore in any subsequent action or actions to recover response costs or other damages incurred by the State, as appropriate and in the interest of justice. 42 U.S.C. § 9613(g)(2).

## PRAYER FOR RELIEF

WHEREFORE, the State requests that this Court enter judgment against Gore as follows:

a.    Finding Gore liable for all costs to assess, investigate, mitigate, clean up and remove, remediate, restore, treat, monitor, and otherwise respond to PFAS contamination from Gore's facilities so the contaminated natural resources are restored to their original condition;

b.    Finding Gore liable for all damages to compensate the residents of the State for the lost use and value of its natural resources during all times of injury caused by PFAS and for such orders as may be necessary to provide full relief to address risks to the State, including, but not limited to, the costs of:

    i.     Past and future testing of natural resources where Gore's PFAS were transported, stored, used, handled, released, spilled, and/or disposed and, thus, likely caused PFAS contamination;

    ii.    Past and future treatment of all natural resources where Gore's PFAS were transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFAS until restored to non-detectable levels; and

    iii.    Past and future monitoring of the State's natural resources where Gore's PFAS were transported, stored, used, handled, released, spilled, and/or disposed as long as there is a detectable presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

    c.    Ordering Gore to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources attributable to Gore's PFAS;

    d.    Ordering Gore to pay all damages to the State at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination attributable to Gore's PFAS;

    e.    Ordering Gore to pay all compensatory damages for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination attributable to Gore's PFAS of such natural resources;

    f.    Ordering Gore to pay all other damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Gore's acts and omissions alleged herein;

g.      Awarding all compensable costs and damages available to the State under CERCLA Section 107(a);

h.      Declaring Gore liable for all past and future response costs pursuant to CERCLA Section 113(g)(2);

i.      Entering an order against Gore to abate or mitigate the PFAS contamination that it caused by its PFAS;

j.      Entering an order requiring Gore to investigate and delineate the full extent of all contamination for which Gore is responsible;

k.      Enjoin Gore from causing further PFAS releases;

l.      Entering an order requiring Gore to establish an abatement fund to ensure the cleanup of its PFAS contamination, so that the waters of the State are in the same state they existed prior to PFAS discharges;

m.      Awarding the State compensatory damages in an amount to be determined by the trier of fact;

n.      Awarding the State punitive damages in an amount to be determined by the trier of fact;

o.      Awarding the State costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

p.      Awarding the State such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

The State demands a trial by jury on all claims for which a jury trial is available.

Dated: December 18, 2024                        ANTHONY G. BROWN
Attorney General of Maryland

*/s/Patricia V. Tipon*
Patricia V. Tipon (28786)
Julie Kuspa (21432)
Matthew Zimmerman (01222)
Assistant Attorneys General
Office of the Attorney General
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
patricia.tipon@maryland.gov
matthew.zimmerman@maryland.gov
julie.kuspa@maryland.gov
(410) 537-3061

ADAM D. SNYDER (25723)
Assistant Attorney General
Office of the Attorney General
120 E. Baltimore Street
Baltimore, Maryland 21202
adam.snyder1@maryland.gov
(410) 767-1409

*and*

SCOTT E. KAUFF (20260)
ALEXANDER LATANISION*
DEREK Y. SUGIMURA (28600)
LAW OFFICES OF JOHN K. DEMA, P.C.
One Central Plaza
11300 Rockville Pike, Suite 112
Rockville, Maryland 20852
skauff@demalaw.com
alatanision@demalaw.com
dsugimura@demalaw.com
(202) 309-0200

MATTHEW K. EDLING*
STEPHANIE D. BIEHL*
ASHLEY B. CAMPBELL*
PAUL M. STEPHAN*
SHER EDLING LLP
100 Montgomery St. Ste. 1410
San Francisco, California 94104
matt@sheredling.com
stephanie@sheredling.com
ashley@sheredling.com
paul@sheredling.com
(628) 231-2500

WILLIAM J. JACKSON*
JOHN D.S. GILMOUR*
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd
Houston, Texas 77027
bjackson@kelleydrye.com
jgilmour@kelleydrye.com
(713) 355-5000

*/s/Melissa E. Byroade*
MELISSA E. BYROADE (31335)
ERIN HODGE*
KELLEY DRYE & WARREN LLP
Washington Harbour
3050 K Street NW, Suite 400
Washington, D.C. 20007
mbyroade@kelleydrye.com
ehodge@kelleydrye.com
(202) 342-8823

*Special Counsel for the State of Maryland*

*\*Pro hac vice applications forthcoming*